# In the United States Court of Federal Claims

No. 15-68C
(Filed: January 16, 2018)*
**\*Opinion originally filed under seal on January 8, 2018**

| | |
|---|---|
| UNITED STATES ENRICHMENT CORPORATION, | Partial Summary Judgment; Privatization Act, 42 U.S.C. § 2297(h); CAS 413-50(c)(12), 48 C.F.R. § 9904.413-50(c)(12); Segment Closing; Allocation of Assets and Liabilities; CAS 413-50(c)(5), 48 C.F.R. §9904.413-50(c)(5), Adjustment for Post-Retirement Health Benefits, FAR 52.216-7, 48 C.F.R. 52.216-7. |
| Plaintiff, | |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

*Thomas A. Lemmer*, Denver, CO, for plaintiff. *Timothy J. Simone*, Washington, DC, *Joseph G. Martinez*, Denver, CO and *Dennis J. Scott*, Bethesda, MD, of counsel.

*Albert S. Iarossi*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director and *Steven J. Gillingham*, Assistant Director, for defendant.

**O P I N I O N**

**FIRESTONE**, *Senior Judge*

Pending before the court are cross motions for partial summary judgment in this breach of contract action brought by plaintiff, United States Enrichment Corporation ("USEC"), against the United States, ("the government") for failing to reimburse USEC for pension costs and post-retirement benefits ("PRBs") USEC incurred in performing contracts for the United States Department of Energy ("DOE") at DOE's Portsmouth, Ohio uranium enrichment facility. During the 1950s until 1993, DOE operated a uranium

enrichment facility at Portsmouth, Ohio and a second facility in Paducah, Kentucky.  In 1992, Congress enacted the Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776-3133 (1992) ("EPACT"), which created USEC's immediate predecessor, a wholly-owned government corporation ("USEC-Government") which assumed responsibility for the government's uranium enrichment beginning in July 1993.  In, 1996, Congress enacted the USEC Privatization Act ("Privatization Act"), 42 U.S.C. § 2297h.  The Privatization Act mandated that the government privatize its uranium enrichment enterprise. Thereafter, on July 28, 1998, USEC became a private enterprise.  U.S. GOV'T ACCOUNTABILITY OFF., GAO-15-730, DEP'T OF ENERGY: TRANSACTIONS INVOLVING USEC INC. SINCE 1998 (2015).  From 1998 to 2010, USEC operated the Portsmouth and Paducah facilities.  Then in 2010, DOE decided to wind down all enrichment work at USEC's Portsmouth facility.  DOE also decided to transfer the remaining clean-up work at Portsmouth to a new contractor.  In response, on January 1, 2011, USEC divided what had been a single cost accounting segment of both Portsmouth and Paducah into two separate segments for cost-accounting purposes under the government's cost accounting regulations.

In March 2011, USEC transitioned its hourly employees to DOE's new contractor. USEC's salaried employees were transitioned to the new DOE contractor in September 2011. Following these actions, USEC informed the government that the Portsmouth segment would close on September 30, 2011.  The closure triggered USEC's obligation to perform a segment closing adjustment under Cost Accounting Standard ("CAS") 413-

50(c)12.[1]  USEC calculated the adjustment using the date it had created a separate

Portsmouth segment, January 1, 2011.  As a result, USEC used January 1, 2011 as the

date for measuring the value of the Portsmouth segment's pension and PRB assets and

liabilities for purposes of determining whether it would owe the government any money

on the grounds that the pension or PRB plans were over-funded or whether the

government would owe USEC money because the plans were under-funded.

The pending cross motions for partial summary judgment present two questions.

First, the parties are seeking a ruling on whether USEC properly used January 1, 2011 as

the date for allocating pension assets and liabilities to the Portsmouth segment for

purposes of the segment closing calculation required by CAS 413.  The government

argues that in order to determine the government's fair share of any pension deficit under

CAS 413, USEC had to allocate pension assets and liabilities to the newly-formed

Portsmouth segment based on historic data for the workers who were employed at the

Portsmouth facility from the earliest period when that data is available and readily

determinable, apparently including the period before USEC became a private enterprise.

The government argues that this requirement is mandated by CAS 413-50(c)(5).[2]  USEC

---

[1] CAS 413-50(c)12 states that "If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The difference between the market value of the assets and the actuarial accrued liability for the segment represents an adjustment of previously-determined pension costs." 48 C.F.R. 9904.413-50(c)(12).

[2] CAS 413-50(c)(5)  states: "For a segment whose pension costs are either required to be calculated separately pursuant to paragraph (c)(2) or (c)(3) of this subsection or calculated separately at the election of the contractor, there shall be an initial allocation of a share in the undivided market value of the assets of the pension plan to that segment, as follows: (i) If the necessary data are readily determinable, the funding agency balance to be allocated to the

contends that CAS 413-50(c)(5) did not require that it allocate assets and liabilities to the new segment using historic data from before creation of the segment on the grounds that before the Portsmouth segment was created there was no historic data for the segment. Rather, USEC argues that the contractor is free to pick any date it finds appropriate to create a segment and to then allocate pension assets and liabilities to that new segment as of that date using the ratio for allocating assets set in CAS 413-50(c)(5)(ii).

Second, the parties are seeking a ruling on whether USEC can recover any deficit for under-funded PRB obligations from the government in the CAS 413 segment closing adjustment or whether the PRB obligations at issue in this case may be properly excluded from any segment closing adjustment.  The government relying on *Raytheon Co. v. United States*, 92 Fed. Cl. 549 (2010), argues that because USEC's Health and Welfare Plan provides that it can terminate or modify its obligation to pay PRBs, those PRBs are not to be included in a segment closing adjustment.[3]  USEC argues that this case is distinguishable from *Raytheon* on the grounds that the PRBs at issue in this case are

---

segment shall be the amount contributed by, or on behalf of, the segment, increased by income received on such assets, and decreased by benefits and expenses paid from such assets. Likewise, the accumulated value of permitted unfunded accruals to be allocated to the segment shall be the amount of permitted unfunded accruals assigned to the segment, increased by interest imputed to such assets, and decreased by benefits paid from sources other than the funding agency; or (ii) If the data specified in paragraph (c)(5)(i) of this subsection are not readily determinable for certain prior periods, the market value of the assets of the pension plan shall be allocated to the segment as of the earliest date such data are available. Such allocation shall be based on the ratio of the actuarial accrued liability of the segment to the plan as a whole, determined in a manner consistent with the immediate gain actuarial cost method or methods used to compute pension cost."

[3] In *Raytheon,* the court held "that health benefits or medical benefits, which clearly do not vest and are terminable at will, are not 'integral to a pension plan" and thus are not included in a segment closing adjustment per CAS 413.  *Raytheon Co. v. United States*, 92 Fed. Cl. 549, 564 (2010)

vested and an integral part of USEC's pension plan under the terms of the Privatization Act. In the unique circumstances of this case, USEC claims that PRBs must be included in the segment closing adjustment. USEC also seeks a ruling, in the alternative, that any deficit in the Portsmouth segment's PRB account that is recoverable from the government by virtue of the Privatization Act is also a recoverable cost under the Federal Acquisition Regulation ("FAR") § 52.216-7.[4]

For the reasons stated below, the court **GRANTS-IN-PART** and **DENIES-IN-PART** plaintiff's motion for partial summary judgment and **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion for partial summary judgment.

## STATEMENT OF FACTS

The parties filed a Joint Stipulation of Undisputed Material Facts (JSUF) setting forth many facts about which the parties agree. The background facts and those relevant to each question presented have been taken from the JSUF and are set forth as follows:

**A.      USEC**

1. Prior to July 1993, the DOE (and its predecessor agencies) operated the Government's uranium enrichment enterprise and operated the gaseous diffusion plants

---

[4]FAR §52.216-7(a)(1) provides "The Government will make payments to the Contractor when requested as work progresses, but (except for small business concerns) not more often that once every 2 weeks, in amounts determined to be allowable by the Contracting Officer in accordance with Federal Acquisition Regulation (FAR) subpart 31.2 in effect on the date of this contract and the terms of this contract. The Contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as the representative may require, an invoice or voucher supported by a statement of the claimed allowable cost for performing this contract."

("GDP") referred to as the Portsmouth GDP near Piketon, Ohio and the Paducah GDP near Kevil, Kentucky.

2. Prior to July 1993, DOE contracted with Management and Operating ("M&O") contractors to operate the GDP at Portsmouth, Ohio, and Paducah, Kentucky.

3. In 1992, Congress, through the EPACT, created USEC's predecessor, USEC-Government, a wholly-owned Government corporation, to assume responsibility for the government's uranium enrichment enterprise beginning in July 1993.

4. EPACT provides that "[i]t is the purpose of this subsection to ensure the establishment of [USEC] pursuant to this subchapter shall not result in any adverse effects on the employment rights, wages, or benefits of employees at facilities that are operated, directly or under contract, in the performance of functions vested in [USEC]." Also, it required the newly created USEC-Government and its contractors to abide by the terms of the collective bargaining agreements in effect on April 30, 1991 at each facility until the earlier of the date on which a new bargaining agreement is signed, or October 24, 1994.

5. In 1996, Congress enacted the "Privatization Act" which authorized the establishment of USEC as a private, for-profit corporation and the transfer of ownership of certain USEC-Government assets and obligations to the private corporation. Pub. L. No. 104-134, 110 Stat. 1321-355 (1996).

6. The Privatization Act specifically required that USEC shall cause the PRBs plan provider (or its successor) to continue to provide benefits "at substantially the same level of coverage as eligible retirees are entitled to receive on the privatization date" to eligible

persons. 42 U.S.C. § 2297h-8(a)(6)(A).  Eligible persons were defined as persons who, as of the date of privatization: (1) had retired as vested participants in a pension plan maintained either by USEC-Government's operating contractor or by a contractor employed prior to July 1, 1993, by DOE to operate a GDP; or (2) were employed at one of the GDPs and were vested participants in such a pension plan. 42 U.S.C. § 2297h-8(a)(6)(B)(i),(ii).  The Privatization Act also required that USEC (a) not diminish accrued, vested pension benefits of employees at the GDPs; and (b) offer employment and abide by the terms of any collective bargaining agreement ("CBA") covering employees on the date of privatization until the stated expiration or termination date of the agreement.  42 U.S.C. § 2297h-8(a)(4)(B).

7. In July 1998, the privatization of USEC was accomplished through an initial public offering.

8. Prior to July 1993, a subsidiary of Lockheed Martin (then Martin Marietta) operated the Portsmouth, Ohio and Paducah, Kentucky GDPs under contract to DOE.  As part of the transition to USEC, that subsidiary was split into Lockheed Martin Energy Systems ("LMES") and Lockheed Martin Utility Services ("LMUS") (at that time Martin Marietta) with LMES continuing to provide services to DOE.  After USEC-Government assumed responsibility in July 1993 until May 18, 1999, LMUS (including its predecessors in interest) operated the Portsmouth, Ohio and Paducah, Kentucky GDPs under an M&O contract with USEC-Government, and, after privatization, USEC.

9. LMES and LMUS, and their respective predecessors, sponsored both a pension plan and a PRB plan for their employees.

7

**B.     Establishment of the USEC Pension and PRB Plans**

10. On May 18, 1999 USEC terminated its M&O contract with LMUS and took over day-to-day operation of the Portsmouth and Paducah GDPs. Certain LMUS employees became USEC employees.

11. At the time of the transfer of LMUS employees to USEC, on May 18, 1999, LMES (which sponsored/administered the pension plan and PRB plan for LMES and LMUS) and USEC executed an Employee Benefit Plan Administrative Services Agreement (the "Administrative Services Agreement").

12. Effective May 18, 1999, USEC created its own pension plan referred to as the Retirement Program Plan for Employees of United States Enrichment Corporation (the "USEC Pension Plan") and its own PRB plan, the United States Enrichment Corporation Health and Welfare Plan (the "USEC PRB Plan").

13. The USEC Pension Plan and PRB Plan continued pension and PRB benefits that had previously been provided by LMUS, and which had been previously provided by USEC-Government preceding the formation of USEC, for employees working at the Portsmouth and Paducah GDPs.

14. On December 17, 1999, USEC and LMUS executed an Agreement of Transfer and Assumption of LMUS Benefit Trust for Salaried Employees and LMUS Benefit Trust for

Collectively Bargained Employees (the "PRB Transfer Agreement").

15. Pursuant to the PRB Transfer Agreement, USEC assumed responsibility for the LMES voluntary employee beneficiary association ("VEBA") trust for payment of PRBs (the "VEBA Trust for PRBs").

16. The VEBA Trust for PRBs was underfunded when it was assumed by USEC.

17. The PRB Transfer Agreement required that USEC "use the assets of the Trusts to provide certain post-retirement medical and life insurance benefits for employees of USEC who are former employees of LMUS."

18. The Privatization Act required the LMES pension plan to transfer assets and liabilities to the USEC Pension Plan for the LMUS personnel who transitioned to USEC.

19. On May 24, 2000, USEC and LMES entered into the Pension Plan Asset Transfer Agreement (the "Pension Transfer Agreement") to comply with the requirements of the Privatization Act.

20. The Pension Transfer Agreement required the USEC Pension Plan to provide a pension to all former LMUS personnel who had participated in the LMES pension plan based upon the accrued benefits under the LMES plan.

21. LMES was required to transfer sufficient assets to USEC to cover all accrued pension liabilities as of May 18, 1999 and to fund the PRB liabilities that exceeded that funding in the VEBA Trust for PRBs that had been transferred to USEC.

22. The amounts transferred by LMES for unfunded PRB liabilities were transferred into the USEC Pension Plan Trust instead of USEC's VEBA Trust for PRBs.

23. On or about July 1, 1999 LMES transferred approximately $400 million to the USEC Pension Plan Trust.

9

24. In June 2000, LMES transferred an additional approximately $172 million to the USEC Pension Plan Trust, including amounts to account for: unfunded pension liability; unfunded PRB liability; earnings and losses on the first transfer from May 31, 1999 to July 1, 1999; earnings and losses on the initial amounts between May 31, 1999 and June 2000; and any earnings or losses on the $172 million in the second transfer from May 31, 1999 through June 2000.

25. The DOE Contracting Officer was aware of the transfers and agreed to and acknowledged the transfers.

26. As a result of the transfers, the USEC Pension Plan Trust and the USEC VEBA Trust for PRBs together included sufficient funding to cover all accrued pension and PRB liabilities as of May 18, 1999.

27. Because LMES transferred the amounts for the unfunded PRB liability into the USEC Pension Plan Trust, the USEC Pension Plan Trust was overfunded as of May 18, 1999,

and the VEBA Trust for PRBs was underfunded as of May 18, 1999.

28. The purpose of USEC's assumption of the LMES VEBA and LMES' transfers to the USEC Pension Plan Trust was to effect the transference of pension and PRB assets and liabilities from the LMES pension plan and PRB plan to the USEC Pension Plan and USEC PRB Plan for the LMUS personnel who had transitioned to USEC as required by the Privatization Act.

**C.    The Cold Standby/Shutdown Contract Terms**

29. In 2001, USEC ceased commercial enrichment at Portsmouth.

10

30. In August 2001, DOE and USEC entered into the Cold Standby/Shutdown ("CSD") Contract for Cold Standby, which included the operations, maintenance, and support activities required to maintain the Portsmouth GDP in a cold standby status. Cold standby ensures that the plant will be maintained in a configuration, such that, if a decision is made to restart, the plant can be restarted and reach a specified production capacity within 18 to 24 months of the decision to restart.  The CSD Contract was undefinitized and subject to further negotiation.

31. The parties negotiated an advance agreement to provide for the removal of amounts contributed to the pension plan by LMES for the PRB liabilities incurred during government operations before determining the pension cost under government contracts.

32. DOE and USEC definitized the CSD Contract on September 9, 2003. The CSD Contract, was awarded on September 9, 2003.

33. The undefinitized and definitized CSD Contract is a cost-type contract.

34. The CSD Contract incorporates FAR § 52.216-7, Allowable Cost and Payment (Dec. 2002), as modified by DOE Acquisition Regulation ("DEAR") § 952.216-7 (Jan. 1997), and incorporates FAR § 52.230-2, Cost Accounting Standards (Apr. 1998).

35. Clause H.22 of the CSD Contract, which implemented an advance agreement between the parties regarding PRB and pension costs, specifically addressed pension and PRB plans, assets, liabilities and costs.

36. On March 26, 2007, the Modification M038 to the CSD was issued to change the scope of the contract from cold standby to cold shut down.

37. On January 24, 2008, DOE and USEC entered into a Forward Pricing Rate Agreement on Post Retirement Benefit and Pension Costs for the United States Enrichment Corporation (the "FPRA").  The FPRA provides that "the allowable costs for PRBs and pensions under this [CSD] Contract will be determined based on Government Cost Accounting Standards (CAS) and Federal Acquisition Regulations (FAR) 31.205-6 and will reflect only service and experience under and during this [CSD] Contract . . . ." The FPRA further provides that for the purpose of measuring pension costs, the excess funds in the USEC Pension Plan Trust resulting from the 1999 transfer into the USEC Pension Plan Trust of amounts to cover the unfunded PRB liabilities are to be subtracted for purposes of calculation.

38. CSD Modification 78, dated August 6, 2010, extended the term for six months to transition the de-lease facilities from USEC to DOE's decontamination and decommissioning ("D&D")  contractor, Fluor BWXT Portsmouth, LLC ("FBP").

**D.    Pension and PRB Benefits During CSD Performance**

39. From 1999 through the conclusion of the CSD Contract, USEC maintained the USEC Pension Plan, a defined benefit pension plan, for its personnel working at Portsmouth.

40. From 1999 through completion of the CSD Contract, USEC maintained the Health and Welfare Plan for its current and retired personnel that included a PRB plan.

41. Personnel working on the CSD Contract and other Government contracts participated in the USEC Pension Plan and the USEC PRB Plan and pension and PRB costs were accrued as a result.

42. All employees that were entitled to participate in the USEC Pension Plan were entitled to participate in the USEC PRB Plan.

43. In 2002, USEC signed a new Collective Bargaining Agreement with the Security, Police, Fire Professionals of America and its Amalgamated Local No. 66 (the "Security CBA") which continued the provision of PRB benefits. The Security CBA incorporates a Letter of Intent, dated June 10, 1988, regarding Major Medical Medicare Supplement Plan for Retirees which provides that:

> For employees retiring and first eligible to receive a benefit starting on or after February 1, 1989, the Company will pay one-half the cost of the Major Medical Medicare Supplement Plan for the retirees at the time the retiree reaches age 65, provided the retiree is enrolled in Medicare Part A and Medicare Part B, and for the retiree's spouse or surviving spouse at the time the spouse reaches age 65, provided the spouse or surviving spouse is enrolled in Medicare Part A and Medicare Part B, and providing such applicants meet the eligibility requirements of the Plan.
>
> The Company shall arrange through an insurance company(s) or other carrier(s) to provide the benefits set forth in the booklet entitled "Retirees Major Medical Medicare Supplement Plan".

44. In 2010, USEC signed a new CBA with the United Steel Workers Local 689 (the "USW CBA") which continued the provision of PRB benefits. The USW CBA provides that:

> For employees retiring during the term of this Contract, the Company will pay one-half the cost of the Major Medical Medicare Supplement Plan for the retirees at the time the retiree becomes eligible for and provided the retiree is enrolled in Medicare Part A and Medicare Part B, and for the retiree's spouse or surviving spouse

at the time the spouse becomes eligible and provided
the spouse or surviving spouse is enrolled in Medicare
Part A and Medicare Part B, and providing such
applicants meet the eligibility requirements of the Plan.
If a retiree and/or spouse do not enroll in Medicare
when eligible, there will be no obligation for the
company to supply Healthcare Insurance, the Union
will be notified of such a situation when it arises…The
Company shall arrange through an insurance
company(s) or other carrier(s) to provide the benefits
set forth in the booklet entitled "Retirees Major Medical
Medicare Supplement Plan.

45. On January 1, 2010, USEC restated the USEC PRB Plan that had been in

effect since 1999 into a separate plan for retirees entitled to receive benefits under the

USEC Health and Welfare Plan for Retirees.

46. With regard to the PRB benefits, the January 1, 2010 USEC Health and

Welfare

Plan for Retirees states:

USEC may amend, modify, or terminate this Plan or
any benefits in this Plan at any time, including to
change the Benefits available under the Plan or the
premiums necessary to purchase the Benefits; provided
that, any amendment to Benefits provided to
Participants who are protected by the USEC
Privatization Act is subject to the provisions of the
Privatization Act. No amendment shall deprive any
Participant or beneficiary of any Benefit to which the
Participant or beneficiary is fully entitled under this
Plan on the date immediately prior to such amendment.
Any termination or partial termination of the Plan shall
not adversely affect the payment of Benefits to which
Participants, their covered Spouses, or their covered
Dependents were fully entitled under the terms of the
Plan prior to the date of termination or partial
termination.

47. The USEC PRB Plan is periodically amended because of, among other things, changes in relevant law and needed clarification. For example, USEC changed the maximum age of covered dependent beneficiaries, imposing a $100,000 lifetime cap for post-age-65 medical and drug claims. USEC also modified the PRB plan to pass through to retirees any costs attributable to the so-called "Cadillac Tax" of the Affordable Care Act.

48. All Government reimbursement of PRB costs resulted in USEC contributions to the VEBA Trust for PRBs that USEC assumed from LMES. The VEBA Trust for PRBs states that:

> Except as provided herein, no portion of the principal or the income of the Trust Fund shall revert to or be recoverable by the Company or ever be used for or diverted to any purpose other than for the exclusive benefit of participants in the Plan and persons claiming under or through them pursuant to the Plan or for such other purposes as permissible under Section 501(c)(9) of the Code.

## E.   Portsmouth Segment Formation and Closing

49. Between 1998 and 2005, USEC was a single CAS segment that performed work at the GDPs in Portsmouth, Ohio and Paducah, Kentucky and USEC's Technology and Manufacturing Center in Tennessee.  The USEC segment had one general and administrative

("G&A") cost pool for domestic and one G&A cost pool for foreign, both of which were allocated across all USEC's work.

50. Between 2005 and 2011, USEC was a CAS 403 home office overseeing two CAS

segments, the USEC segment comprised of the GDPs in Portsmouth, Ohio, and Paducah,

Kentucky and the technology center in Tennessee and a segment for NAC International.

Each segment had a G&A cost pool that included allocations from the USEC home

office.

51. Effective January 1, 2011, USEC split the USEC segment, which included two

GDPs in Portsmouth and Paducah, into one segment for the Portsmouth GDP and one

segment for the Paducah GDP.

52. As of January 1, 2011, the Government had: begun to "de-lease" portions of

the Portsmouth GDP so that USEC could no longer use the de-leased portions;

commenced predecontamination and decommissioning ("pre-D&D") work at the

Portsmouth GDP; stated the Government's intent that it would not extend the CSD

Contract with USEC; and precluded USEC from competing on the new pre-D&D

contract based on the contracting officer's determination that USEC had an

organizational conflict of interest.

53. By letter, dated May 20, 2011, USEC informed the Government that USEC

would

close its Portsmouth segment as a result of the materially changed circumstances at the

Portsmouth GDP and that the end of the CSD Contract would constitute a segment

closing that would trigger CAS § 413-50(c)(12).

54. In a letter USEC sent to DOE, dated September 21, 2011, USEC stated:

> The circumstances under which Portsmouth operates changed
> materially when DOE decided to end the Cold Shutdown Contract
> and consolidate both D&D and BOP operations under another

16

contractor's D&D contract. This material change meant that,
beginning January 1, 2011, cost allocations within a single
segment composed of both Portsmouth and Paducah would no
longer be equitable as required by CAS.

55. USEC's September 21, 2011 letter submitted the initial CAS Disclosure

Statement for Portsmouth as a CAS segment, which stated that the CAS Disclosure

Statement was effective as of January 1, 2011. The CAS Disclosure Statement also stated

that the Portsmouth segment reported to the USEC home office and was allocated costs

from the USEC CAS 403 home office pool and that Portsmouth maintained its own G&A

cost pool.

56. To date, the Government has not informed USEC that the Government

believes the creation of the Portsmouth segment failed to comply with CAS.

57. In March 2011, at the Government's direction, USEC began transitioning

USEC's

hourly operational employees to the DOE D&D contractor, but retained the salary

personnel, hourly security personnel, and leased-back certain hourly operations personnel

necessary to manage facilities at the Portsmouth GDP.

58. FBP, in assuming responsibility of the D&D contract covering the Portsmouth

facility, entered into an agreement with USEC to hire substantially all of the hourly work

force, effective March 28, 2011.

59. FBP contracted with USEC to lease certain USEC employees for a period of

time

beginning March 28, 2011, through September 30, 2011. These employees were

considered

employees of USEC during this period. By September 30, 2011, substantially all of these

USEC employees became FBP employees. At that time, those former USEC employees

no longer were entitled to accrue pension or PRB benefits and were able to immediately

begin drawing pension and PRB benefits in accordance with the plans.

60. In September 2011 USEC's remaining salary employees (other than a few who

left USEC, were transferred to another USEC facility, or were retained to support

remaining

USEC operations (e.g., finance)) were transitioned to the DOE D&D contractor.

61. The Portsmouth GDP lease between the Government and USEC ended on

September 30, 2011.

62. The Portsmouth segment closed on September 30, 2011.

63. On October 3, 2011, USEC informed the Government that the Portsmouth

Segment had closed as of September 30, 2011. The closing of the Portsmouth segment

triggered an adjustment of previously determined pension costs under CAS § 413-

50(c)(12).

**F.     Portsmouth Pension Costs**

64. USEC maintained records and measured pension costs separately for the

Portsmouth and Paducah segments for the period from January 1, 2011 through

September 30, 2011.

65. To measure segment pension costs for the period January 1, 2011 through September 30, 2011, USEC assigned an actuarial accrued liability of the Pension Plan to the Portsmouth segment and to the Paducah segment based on the calculated actuarial accrued liability for each employee, as of December 31, 2010, assigned to each segment effective January 1, 2011.

66. To measure segment pension costs for the period January 1, 2011 through September 30, 2011, USEC assigned the market value of assets for the Pension Plan to Portsmouth and to Paducah as of December 31, 2010, based on actuarial accrued liabilities assigned to each segment as of December 31, 2010.

67. USEC calculated a CAS § 413-50(c)(12) adjustment amount using the pension assets and liabilities for Portsmouth as of September 30, 2011, measured based upon the assets

and liabilities assigned to Portsmouth on January 1, 2011, as adjusted for actual experience

between January 1, 2011 and September 30, 2011.

68. USEC invoiced the DOE for the adjustment of previously-determined pension costs. DOE rejected the invoice and has not paid this amount. The August 27, 2014 Contracting

Officer's Final Decision is attached as Exhibit 16.

69. USEC maintains certain pension records that predate the formation of the Portsmouth segment (i.e., that predate January 1, 2011). Pension records for the period

prior to January 1, 2011 were maintained for the pension benefits, and associated

liabilities, for all

eligible employees at the USEC operating segment, comprised of the Paducah and

Portsmouth locations, but were not segregated or maintained separately for either

location.

70. Solely for purposes of the parties' motions for partial summary judgment the Parties

stipulate that:[5] (1) accounting and actuarial data for some period prior to the January 1,

2011 creation of the Portsmouth segment is reasonably available in a form and nature

sufficient to calculate a Portsmouth segment closing adjustment obligation as accurately

and

comprehensively as USEC's calculations as of January 1, 2011; and (2) this data could

support a calculation of a lower Government obligation to USEC than pension asset and

liability amounts measured as of the creation of the Portsmouth segment on January 1,

2011.

---

[5] The parties have not yet conducted discovery regarding the availability or quality of the pension asset and liability data available prior to January 1, 2011. The parties, however, have a legal dispute as to whether any pension asset and liability data from a date prior to the formation of the CAS segment is relevant to determining that CAS segment's assets and liabilities at the segment's creation. Resolution of this threshold legal issue will determine if additional discovery is required regarding pension data. The Parties have reserved all rights and objections permitted under the Rules of the Court of Federal Claims related to such discovery, if discovery is needed, including the scope of any such discovery.

71. The effect of using accounting and actuarial data as of a date prior to January 1, 2011, on the Government's obligation to USEC for the closing of the Portsmouth segment would

vary depending upon which prior date is selected, as a result of, among other things, differing market conditions.

## G.    Portsmouth PRB Costs

72. USEC maintained records and measured PRB costs separately for the Portsmouth and Paducah segments for the period from January 1, 2011 through September 30, 2011.

73. To measure segment PRB costs for the period January 1, 2011 through September 30, 2011, USEC assigned an actuarial accrued liability of the USEC PRB Plan to the

Portsmouth and Paducah segments based on the calculated actuarial accrued liability for each employee as of December 31, 2010, assigned to each segment effective January 1, 2011.

74. To measure segment PRB costs for the period January 1, 2011 through September 30, 2011, USEC assigned the market value of assets for the USEC PRB Plan to Portsmouth and Paducah segments as of December 31, 2010, based on the calculated actuarial accrued liabilities assigned to each segment as of December 31, 2010.

75. USEC calculated the amount claimed for PRB liabilities as of the closing of the Portsmouth segment pursuant to CAS § 413-50(c)(12); the same manner USEC used to calculate the amount claimed for pension liability.

21

76. For financial reporting purposes, USEC's parent company (USEC, Inc.) reported

a PRB curtailment cost for 2011, due to the closing of the Portsmouth segment. USEC Inc.'s

fiscal year 2011 Securities and Exchange Commission Form 10-K is attached as Exhibit 17.

77. USEC, Inc. recognized the PRB costs caused by the Portsmouth Segment closing in its fiscal year 2011 for financial reporting purposes.

78. USEC invoiced DOE for USEC's calculation of unfunded PRBs on the basis that

USEC is entitled to recover its segment closing PRB cost, as the cost of PRB benefits, as an

allowable cost pursuant to FAR § 52.216-7 or pursuant to CAS § 413-50(c)(12). DOE rejected the invoice and has not paid this amount.

## DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate when there are no genuine issues as to any material fact, and the moving party is entitled to judgment as a matter of law.  Rules of the Court of Federal Claims ("RCFC") 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A fact is material if it might affect the outcome; an issue is genuine if a reasonable trier of fact could find for the nonmoving party.  *Anderson*, 477 U.S. at 248.  Moreover, "an asserted issue of material fact is not 'genuine' in the sense of

... Rule 56 if a reasonable [trier of fact] could only resolve the question for the moving party." *Vehicular Tech. Corp. v. Titan Wheel Intern., Inc.,* 212 F.3d 1377, 1381 (Fed. Cir. 2000).

Cross-motions for summary judgment do not constitute admissions that no genuine issues of material fact remain, *see Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed. Cir. 1997), nor does the rejection of one party's motion necessarily allow that of the other party. *Moreno v. U.S.*, 82 Fed. Cl. 387, 395 (2008). Instead, where both parties move for summary judgment and allege an absence of any genuine issues of material fact, the Court still must determine independently the appropriateness of summary disposition in a particular case, evaluating each motion on its own merits. *Prineville Sawmill Co., Inc. v. U.S.,* 859 F.2d 905, 911 (Fed. Cir. 1988).

**B.    CAS 413-50(c)(5) Requires USEC To Use Readily Available Accounting And Actuarial Data Dating From the Creation of USEC as a Private Entity for Purposes of Allocating Pension Assets and Liabilities**

It is not disputed that the government bears the burden of showing that a contractor's segment closing calculations do not comply with CAS 413. *Raytheon Co. v. United States*, 747 F.3d 1341, 1353 (Fed. Cir. 2014). USEC contends that the government has not met its burden because USEC complied with CAS 413 when it used January 1, 2011 as the date for allocating pension assets and liabilities to the Portsmouth segment. Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. (Pl.'s Mem.) at 11. According to USEC, it was not "required" by CAS 413 to use an earlier date to allocate assets and liabilities to the Portsmouth segment. *Id.* USEC argues that the CAS does not require USEC to go through all of its available personnel records to determine: (1) who

was doing work at the Portsmouth facility during the years it was operated by USEC; (2) what the pension liabilities for those employees were for the years USEC operated the Portsmouth facility; (3) what assets had been charged to the government to pay for those liabilities over those years; (4) what market returns USEC received on the pension assets it received from the government under its contracts during its years of operation and (5) what payments were made to beneficiaries from those assets. *Id.* at 11. USEC does not dispute that it could do this analysis for a period before January 1, 2011. JSUF ¶ 70. It argues, however, that it is not "required" to do so by the CAS. Pl.'s Mem. at 12. In particular USEC focuses on CAS 413-50(c)(5) use of the term segment to argue that the earliest set of data for the Portsmouth segment would be January 1, 2011 when it was created and that there is no earlier set of data that can be directly attributable to the Portsmouth segment because it was not in existence prior to January 1, 2011. *Id.* at 12-13. USEC further argues that requiring USEC to allocate pension asset and liabilities before the creation of the Portsmouth segment would create an overly complicated process and would undermine a contractor's prerogative to create new segments when it deems it appropriate. *Id.* at 14-16. Thus, USEC concludes it complied with CAS 413-50(c)(5) when it allocated pension and PRB assets and liabilities to the new Portsmouth segment as of the date it was established.

The government argues that USEC's reading of CAS 413-50(c)(5) is wrong and that CAS 413 requires that the contractor undertake the evaluation of the 5 issues identified by USEC using the earliest date when data is available. Def.'s Cross-Mot. for Partial Summ. J. and Opp'n to Pl.'s Mot. for Partial Summ. J (Def.'s Cross-Mot.) at 6.

24

The government argues that because USEC concedes these data are available for the Portsmouth segment, USEC must re-calculate its segment closing adjustment using an allocation of assets to the Portsmouth segment that is based on data that goes back to the earliest date when USEC began operating the Portsmouth facility. *Id.* at 8.

Before deciding whether USEC or the government's reading of CAS 413-50(c)(5) is correct, the court must first examine the reasons for allocating pension assets to a segment. The reason pension assets and liabilities were allocated to the Portsmouth segment was to allow for a segment closing adjustment. Segment closing adjustments are necessary when the government will no longer be making payments on behalf of the segment employees after the segment closes and thus the parties need to determine whether the government is either entitled to payment because its contributions resulted in an overfunded pension plan or is required to pay the contractor more because the pension plan is underfunded for the relevant plan participants. A segment closing adjustment has been described by the Federal Circuit as follows: "CAS 413 requires the contractor, following a segment closing, to 'determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment. . .' The difference between the market value of the assets and the actuarial accrued liability for the closed segment represents an adjustment of previously determined pension costs. Hence, the goal of a segment closing adjustment is to determine the present value of the pension plan at the time of the segment's closing and to adjust the plan's value to ensure it is fully-funded to meet the promises made to the plan's participants." *Raytheon*, 747 F.3d at 1346. Thus, whether USEC is entitled to additional payments on an adjustment of

previously determined pension costs with regard to the Portsmouth segment closing

depends on whether the segment closing adjustment for the segment gives rise to a

pension surplus or pension deficit to meets the promises made to the plan's participants.

The outcome of this question turns on the application of CAS 413-50(c)(5) in the context

of CAS 413-50(c)(12).

As noted, the relevant provisions of CAS 413-50(c)(5)(i),(ii) and (12) state in

relevant part as follows:

> If the necessary data are readily determinable, the funding agency balance to be allocated to the segment shall be the amount contributed by, or on behalf of, the segment, increased by income received on such assets, and decreased by benefits and expenses paid from such assets. Likewise, the accumulated value of permitted unfunded accruals to be allocated to the segment shall be the amount of permitted unfunded accruals assigned to the segment, increased by interest imputed to such assets, and decreased by benefits paid from sources other than the funding agency.  CAS 413-50(c)(5)(i).

> If the data specified in paragraph (c)(5)(i) of this subsection are not readily determinable for certain prior periods, the market value of the assets of the pension plan shall be allocated to the segment as of the earliest date such data are available. Such allocation shall be based on the ratio of the actuarial accrued liability of the segment to the plan as a whole, determined in a manner consistent with the immediate gain actuarial cost method or methods used to compute pension cost. Such assets shall be brought forward as described in paragraph (c)(7) of this subsection.  CAS 413-50(c)(5)(ii).

> If a segment is closed, if there is a pension plan termination, or if there is a curtailment of benefits, the contractor shall determine the difference between the actuarial accrued liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The difference between the market value of the assets and the actuarial accrued liability for the segment represents an adjustment of previously-determined pension costs.  CAS 413-50(c)(12).

The court finds for the reasons that follow that USEC did not properly apply CAS 413 when it failed to allocate pension assets and liabilities to the newly-created Portsmouth segment using data from the earliest date that USEC had data for the employees (i.e. plant participants) past and present associated with Portsmouth.  First, it is undisputed that USEC is in possession of data dated prior to January 1, 2011 which it could use to do an allocation of pension assets and liabilities for the Portsmouth segment. Indeed, USEC not only admits to this, but also admits that it used data from October 1, 2010 to calculate "Government services actuarial accrued liabilities," *i.e.*, liabilities for the Portsmouth segment as of January 1, 2011, and then projected those liabilities forward to June 30, 2011.  Def.'s Cross-Mot. at 11 (citing Exhibit 13 to JSUF at page Bates-labeled USEC_DOE_PPPO00011176).  If USEC could perform its calculations from October 1, 2010 it can do it for earlier periods.  In this connection, as the government notes, the plan participants that make up the Portsmouth segment did not begin employment on January 1, 2011. Indeed, USEC concedes it took into account the existence and liability of 612 retired and terminated employees with vested rights when it allocated assets to the new Portsmouth segment. Def.'s Reply in Supp. of its Cross Mot. For Partial Summ. J. at 6.

Second, the court finds USEC's reading of CAS 413 to be incorrect.  When a segment has to be created in order to calculate a segment closing adjustment, CAS 413 mandates that the contractor re-create the pension history of the newly-formed segment with the best data available to determine whether over time the amounts contributed by the government may have given rise to an over or under funded pension obligation.  If

27

complete data regarding pension costs and payments for the past and present plan participants making up the new segment is available then the calculations must be based on that complete data set.  Contrary to USEC's contentions, CAS 413-50(c)(5) does not give a contractor free reign in deciding how to allocate pension assets to a new segment by picking an arbitrary date for assigning pension assets.  To the contrary, the CAS recognizes that pension assets and liabilities follow the plan participants employed to various government contracts with business units.  Contractors must use the earliest date for which it has a complete data regarding the government's contributions to the pension obligations for those past and present plan participants when the contractor makes the allocation.  USEC's contention that the government is improperly attempting to "read out" the word "segment" from section (c)(5), is not supported.  Section (c)(5) never uses the phrase "segment's data" or "data of the segment."  Rather, the data relates to the data on pension assets and liabilities.  Using such asset data, the CAS requires a share of the market value of the assets attributable to the government's contribution to plan participants under contracts involving the facility to be closed to be allocated *to the segment*.

Moreover, USEC's reading of CAS 413-50(c)(5) could lead to serious abuses.  If contractors are free to create segments at will and to then close segments at will without taking into account the contractor's historic contractual relationship with the government at the plant or facility, contractors would have an incentive to open and close segments whenever they believed the pension plans were seriously underfunded in order to impose

28

the maximum cost on the government without regard to the government's historic contributions to the pensions of employees tied to that segment.

Finally, to the extent USEC argues that while it is possible to recreate the asset and liability history for the Portsmouth segment the task would be too burdensome, the argument must be rejected. USEC has stipulated that pre-2011 data is reasonably available. JSUF ¶ 70. Indeed, it could not have come up with an asset and liability allocation to the new Portsmouth segment if it did not have the necessary data for at least some period of time before January 1, 2011. Because historic data exists and is reasonably available to USEC it must be used to comply with CAS 413.

For all of these reasons, USEC must employ CAS 413-50(c)(5)(i) or (ii), depending on the data readily available in its final CAS 413 calculations.

## C. Unfunded PRBs are Recoverable By USEC from the Government To the Extent Provided in Section (a)(6)(A) and (B) of the Privatization Act

CAS 412 and CAS 413 provide that in addition to pension benefits, "*Additional* benefits such as permanent and total disability and death payments, and survivorship payments to beneficiaries of deceased employees may be an *integral* part of a pension plan," and thus these benefits may be included in a segment closing adjustment. CAS 412-30(a)(20); CAS 413-30(a)(12) (emphasis added). The question presented in this case is whether PRBs are "additional benefits" that were "integral" to USEC's pension plan and thus properly included in a segment closing adjustment.

The court faced a similar question in *Raytheon*. In that case, the court agreed with the government that the terms "additional benefit" and "integral" to a pension plan must

be construed against the back drop of CAS 412 and CAS 413 which were established with the enactment of the Employee Retirement Income Security Act of 1974 ("ERISA"). *Raytheon,* 92 Fed. Cl. at 562-63. The court distinguished between pension benefits – which can become vested and are protected by the Pension Benefit Guaranty Corporation (PBGC) under ERISA – and welfare benefits which are not necessarily vested and are therefore not necessarily guaranteed. *Id.* at 563-64. The court opined that if additional benefits are guaranteed and cannot be terminated that the benefits might be included in a segment closing adjustment. *Id.* Where PRBs are not vested and can be terminated by an employer at will, however, the court concluded that the costs associated with PRBs may not be included in the segment closing adjustment. *Id.* at 562. As the court stated, because the health benefits or medical benefits at issue in *Raytheon* "clearly do not vest and are terminable at will," those benefits "are not integral to a pension plan." *Id*. In keeping with the distinction made between vested and non-terminable benefits and non-vested and terminable benefits, the court in *Raytheon* held that disability and death payments, as well as survivorship payments, which were vested were integral to pension benefits and could be included in a segment closing adjustment. *Id.*

USEC argues that the PRBs provided for in the USEC Health and Welfare Plan should be treated as vested and integral to the USEC's pension plan for a variety of reasons. First and foremost, USEC argues that the Privatization Act worked to make PRBs akin to pension obligations because under the Privatization Act USEC is legally required to continue offering PRBs to those who had previously received PRBs and to also continue to abide by the terms of any unexpired CBAs including CBAs that require

USEC to pay PRBs.  Pl.'s Mem. at 17.  According to USEC, because the CBAs provide

for PRBs, and because the Privatization Act required USEC to abide by the CBAs, the

PRBs are vested and integral to USEC's pension plan (and thus subject to a segment

closing adjustment).  *Id.* at 18-20.  The government argues that under the Privatization

Act CBAs do not guarantee PRBs beyond the date of the CBA. Def.'s Cross Mot. at 20.

The court agrees with the government.

     The Privatization Act provides as follows:  "Privatization shall not diminish the

accrued, vested *pension benefits* of employees of the Corporation's operating contractor

at the two gaseous diffusion plant."  42 U.S.C. § 2297h-8(A)(1) (emphasis added).  The

Act then states that any employer at the Portsmouth or Paducah plants must "abide by the

terms of any unexpired collective bargaining agreement covering employees in

bargaining units at the plant and in effect on the privatization date *until the stated*

*expiration or termination date of the agreement.*"  42 U.S.C. § 2297h-8(a)(3) (emphasis

added).  In the event USEC replaced its operating contractor at either plant, the new

employer shall "abide by the terms of the predecessor contractor's collective bargaining

agreement *until the agreement expires or a new agreement is signed.*"  42 U.S.C. §

2297h-8(a)(4)(B) (emphasis added).  Thus, PRBs under this provision are not guaranteed

since the Act does not require PRBs beyond the life of the CBA. As such, CBA  health

benefits are not vested or integral to the pension plan and the government correctly

argues that these benefits are not included in a segment closing adjustment based on the

language of the Privatization Act.

The Privatization Act goes on to provide, however for special post-retirement health benefit guarantees to certain eligible retirees and the court finds that these benefits are guaranteed and integral to the pension plan for the individuals covered. Section (6)(A) of the Act provides that:

> [USEC] shall cause the post-retirement health benefits plan provider (or its successor) to continue to provide benefits for eligible persons …employed by an operating contractor at either of the gaseous diffusion plants in an economically efficient manner and at substantially the same level of coverage as eligible retirees are entitled to receive on the privatization date. 42 U.S.C. § 2297h-8(a)(6)(A).

Section (6)(B) states that the persons eligible for coverage under subparagraph A above:

> shall be limited to:(i) persons who retired from active employment at one of the gaseous diffusion plants on or before the privatization date as vested participants in a pension plan maintained either by the Corporation's operating contractor or by a contractor employed prior to July 1, 1993, by the Department of Energy to operate a gaseous diffusion plaint; and (ii) persons who are employed by the Corporation's operating contractor on or before the privatization date and are vested participants in a pension plan maintained by the Corporation's operating contractor or by a contractor employed prior to July 1, 1993, by the Department of the Energy to operate a gaseous diffusion plant. 42 U.S.C. § 2297h-8(a)(6)(B).

The government acknowledges that the language of the Act may cover certain employees but disputes that the provision establishes a vested PRB right covered by CAS 413 on the grounds that USEC has modified benefits under its Health and Welfare plan and thus it has not continued to provide coverage at substantially the same level as required by the Privatization Act.  Def.'s Cross Mot. at 19-21. According to the government by failing to keep the PRBs the same, USEC has lost

the right to claim that the PRBs are not terminable and thus integral to the pension plan for purposes of CAS 413.

The court finds, contrary to the government's contentions, that to the extent the Privatization Act has guaranteed to certain employees continued PRB health benefits under Section (6)(A) and (B) those benefits are vested, are not terminable, and are guaranteed by the government and thus should be included in the segment closing adjustment. With regard to the persons covered by Section (6)(A) and (B), the fact that USEC may have altered the benefit does not mean that the benefit is not vested or that it can be terminated and is not guaranteed by the government. The Act requires post-retirement health benefits at "substantially the same level of coverage as eligible retirees are entitled to receive on the privatization date." 42 U.S.C. §2297h-8(a)6(A). USEC contends that while it made certain changes in its plan it did not diminish the level of coverage. Regardless, the right to ensure substantially the same level of coverage belongs to the eligible plan participants and not the government. By its terms, Congress has provided that the government will ensure that the individuals covered will receive the post-retirement health benefits promised. The government is bound by its statutory obligation.

The government argues that to the extent plan participants are not included in Section (6)(A) and (B), the plan participants are not entitled to have their PRB health benefits included in a segment closing adjustment. Def.'s Cross-Mot. at 21. The court agrees. It is clear from a review of the USEC Health and Benefit Plan language that USEC's plan is no different than the plan at issue in *Raytheon*. The USEC plan expressly

states that "USEC may amend, modify, or terminate this Plan or any benefits in this Plan at any time, including to change the Benefits available under the Plan or the premiums necessary to purchase the Benefits; provided that, any amendment to Benefits provided to Participants who are protected by the USEC Privatization Act is subject to the provisions of the Privatization Act." JSUF, Ex. 3, § 6.1. Thus by its terms only those beneficiaries with vested rights under the Privatization Act (i.e. those included in Section (6)(A) and (B)) are protected from losing their post-retirement health benefits. USEC argues that under the plan others are also protected because the plan goes on to state that "no amendment shall deprive any Participant or beneficiary of any Benefit to which the Participant or beneficiary is fully entitled under this Plan on the date immediately prior to such amendment." Pl.'s Mot. at 19, citing JSUF Ex. 3, § 6.1. The court, however, reads this sentence together with the next which states that "any termination or partial termination of the Plan shall not adversely affect the payment of Benefits to which Participants, their covered Spouses, or their covered Dependents were fully entitled under the terms of the Plan prior to the date of termination or partial termination," to mean only that beneficiaries are entitled to benefits in the pipeline before an amendment to the plan or its termination. JSUF Ex. 3, §6.1. The plan does not by its terms guarantee any benefits after a plan modification or plan termination. As such, outside of those covered in Section(6), plan participants covered by USEC's Health plan do not have guaranteed benefits and thus the costs associated with paying for that plan after a segment closing are not subject to a segment closing adjustment under CAS 413.

**D. PRB Costs Are Not Reimbursable Under the FAR**

34

Finally, the court turns to USEC's contention that it is entitled to a lump sum payment for any underfunded liabilities under its Health and Welfare Plan not covered by a segment closing adjustment under the FAR. USEC argues that FAR § 52.216-7[6] permits such a payment. Pl.'s Mem. at 28-29.  Specifically, USEC asserts that FAR §52.216-7 allows USEC to recover allowable costs per FAR § 31.201-2[7] which include PRB costs.  *Id.* at 28.  USEC argues that throughout the term of the CSD Contract, the government reimbursed USEC for PRB costs and that the only limitation to recovery would be under FAR § 31.205-6(o)[8], which defines what PRB costs are allowable.  *Id.* at 28-29.  The government disagrees and argues that PRB costs for those not vested under the Privatization Act were allowable only during the period USEC was performing work for the government at Portsmouth and that once the Portsmouth contract ended so did the

---

[6] FAR § 52.216-7 (a)(1) provides "The Government will make payments to the Contractor when requested as work progresses, but (except for small business concerns) not more often that once every 2 weeks, in amounts determined to be allowable by the Contracting Officer in accordance with Federal Acquisition Regulation (FAR) subpart 31.2 in effect on the date of this contract and the terms of this contract.  The Contractor may submit to an authorized representative of the Contracting Officer, in such form and reasonable detail as the representative may require, an invoice or voucher supported by a statement of the claimed allowable cost for performing this contract."

[7] FAR § 31.201-2(a) provides "A cost is allowable only when the cost complies with all of the following requirements:  (1) Reasonableness. (2) Allocability. (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances. (4) Terms of the contract. (5) Any limitations set forth in this subpart.

[8] FAR § 31.205-6(o) states "Postretirement benefits other than pensions (PRB). (1) PRB covers all benefits, other than cash benefits and life insurance benefits paid by pension plans, provided to employees, their beneficiaries, and covered dependents during the period following the employee's retirement.  Benefits encompassed include, but are not limited to, postretirement health care, life insurance provided outside a pension plan; and other welfare benefits such as tuition assistance, day care, legal services, and housing subsidies provided after retirement. (2) to be allowable, PRB costs shall be incurred pursuant to law, employer-employee agreement, or an established policy of the contractor, and shall comply with paragraphs (o)(2)(i), (ii), or (iii) of this subsection."

government's obligation.  Def.'s Cross-Mot. at 25.  In support, the government relies on

the parties' Forward Pricing Rate Agreement (FPRA) which stated with regard to PRB

costs that "the allowable net *periodic* PRB cost shall be limited to the government

business share." *Id.* citing JSUF Exhibit 8 at 2 (emphasis added).  The government reads

this provision  of the FPRA to mean that only costs incurred in connection with

government work during the term of Portsmouth contract, *i.e.*, the "periodic" costs

described above, were to be paid and that when the contract ended so did the

government's payment obligation.  *Id.*

   The court agrees with the government that the more specific PRB provision in the

FPRA controls and that by its terms the government's obligation to pay PRB costs ended

when the contract ended.  This conclusion is also consistent with the court's holding in

*Raytheon* that the FAR does not mandate that the government provide a lump sum

payment for PRBs when the PRB plan can be modified or terminated 'at will.'"

*Raytheon,* 92 Fed. Cl. at 569.  Specifically, the court gave deference to the Civilian

Agency Acquisition Council and the Defense Acquisition Regulatory Council's

consideration and rejection of language that would have incorporated a segment closing

adjustment for PRB costs into the FAR but rejected the provisions on the grounds that a

provision is not appropriate if the benefits can be terminated "at any time." *Id.*  Where, as

here, USEC can modify or terminate health and welfare benefits under its plan "at any

time," the FAR does not allow for payment of unfunded PRBs.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is

**GRANTED-IN-PART and DENIED-IN-PART** and the government's motion for

partial summary judgment is **GRANTED-IN-PART and DENIED-IN-PART**.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge
